# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 19, 2011 Session

## ALAN HOWARD PETERS ET AL. v. CASEY BURGESS ET AL.

**Appeal from the Circuit Court for Bledsoe County**
**No. 4275     Buddy D. Perry, Judge**

**No. E2010-01324-COA-R3-CV-FILED-October 24, 2011**

Alan Howard Peters was seriously injured when his vehicle collided with logs that had rolled off a truck. He and his wife filed this personal injury action and thereafter settled their claims against the defendant tortfeasors for policy limits of $1 million. In doing so, they reserved their claim against the uninsured motorist ("UM") carrier, Cincinnati Insurance Company ("CIC"). The UM provisions in effect with CIC were set forth in an endorsement to a 2005 renewal of an umbrella policy. The UM endorsement to the original policy issued in 1999 and to the first renewal issued in 2002 expressly limited UM coverage to $1 million. A space in the 2005 renewal endorsement form that was intended for insertion of the UM policy limits was left blank, which, by default, rendered the limits of the UM endorsement equal to the $2 million liability limits of the umbrella policy. After the dismissal of the claims against the tortfeasors, CIC amended its answer to include a counterclaim asking the court to reform the policy to make the UM limits equal to the $1 million limits of the previous policies. The trial court entered an order reforming the policy. Subsequently the court entered an order dismissing the remaining claim against CIC. Mr. and Mrs. Peters appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

W. Holt Smith, Madisonville, Tennessee, and Howard L. Upchurch, Pikeville, Tennessee, for the appellants, Alan Howard Peters and wife, Edith H. Peters.

Alaric A. Henry, Kathryn Russell and Sam Anderson, Chattanooga, Tennessee, for the appellee, Cincinnati Insurance Company.

# OPINION

## I.

On August 7, 2006, Alan Howard Peters ("the Insured") was driving his automobile toward the east into a curve on State Highway 30 near Pikeville when he encountered a tractor-trailer loaded with logs traveling west. The Insured was following a produce truck. The logs shifted and fell onto the highway. The Insured collided with the logs and sustained severe injuries, including injuries to his brain.

The Insured and his wife, Edith H. Peters,[1] filed this action against the driver and the owner of the log truck. Pursuant to the UM statutory scheme, they put their UM carrier, CIC, on notice of a claim under their policy by serving CIC with a copy of the complaint. CIC, by counsel, filed a notice of appearance in the case. When the logger alleged in its answer that the driver of the produce truck caused the accident, the Insured amended the complaint to assert a claim against the owner-driver of the produce truck. Eventually the Insured settled all claims with the tortfeasors and entered an order dismissing them as parties. The order specifically states that, pursuant to Tenn. Code Ann. § 56-7-1206 (2008), the Insured is preserving a claim against CIC. It is undisputed that the Insured was paid all available policy limits totaling $1 million.

The UM coverage in effect with CIC at the time of the accident was issued in 2005 as an endorsement to a commercial umbrella liability policy ("the 2005 CIC policy"). It was the second renewal of a policy that was originally issued in 1999 ("the 1999 CIC policy"). The first renewal was in 2002 ("the 2002 CIC policy"). Both the 1999 CIC policy and the 2002 CIC policy had liability limits of $2 million and UM limits of $1 million. When the 2005 CIC policy was issued, the UM endorsement, form number "US 203 09 02 [("Form 203")]," stated: "The Limit of Insurance available under this endorsement is the Limit of Insurance shown in the Declarations for Each Occurrence or $_____, whichever is less." The space in the form was left blank, the result of which, under the language of the endorsement, was to make the UM limits equal to the UM liability limits of $2 million. CIC, thus, had potential exposure of $1 million above what the tortfeasors paid.

CIC amended its answer to include a counterclaim asserting that the blank in the form was a mistake and that it was the intent of the parties that the policy be renewed with UM limits of $1 million. CIC sought reformation of the policy and dismissal of the complaint on

---

[1]Mrs. Peters' claim is derivative in nature. References to the Insured should be construed to include Mrs. Peters where the context permits. The CIC policy was issued to FLX Industries, a company owned by Mr. Peters. It is undisputed that he is a named insured under the policy.

the ground that the Insured's settlement with the tortfeasors was in an amount equal to the intended UM policy limits.

The trial court heard the following proof without a jury. The Insured had dealt with Hugh Huffaker of Huffaker Insurance Agency since 1994. Huffaker sells insurance for various carriers including CIC. The Insured has owned and operated several businesses and had arranged for insurance coverage through Huffaker. The Insured testified that he has tried to err on the side of coverage over price. Typically, Huffaker tried to find the best coverage for the best price. In 1999, the Insured's coverage was moved from USF&G Insurance Company to CIC. The USF&G umbrella policy provided $1 million of liability coverage and $1 million UM coverage. Huffaker called the Insured and advised the Insured that he had found a carrier that provided more coverage for a lesser premium. Huffaker completed the application and submitted it to CIC. The application included a request for $1 million in UM coverage. The Insured did not sign or read the application. On May 26, 1999, Huffaker mailed the Insured the 1999 CIC policy under letter of the same date that stated:

> Enclosed are your new property, garage liability and umbrella polices through the Cincinnati Insurance Company. Your policies came in $1 less than we expected. As you will recall, we changed your polices to the Cincinnati Insurance Company because their premium was $3,418 less than USF&G, your umbrella limit was increased to $2,000,000, and your policies are on a three-year guaranteed rate.

As with the CIC application, the Insured did not read the policy. He did not recall ever having a discussion of the UM limits with Huffaker. He testified, however, that he "understood" that the UM coverage provided in the umbrella was the same as the liability limits because

> I was convinced that if you have your underlying policies in place, you have an umbrella, then . . . when [the underlying policies] expire, regardless of what the underlying is, then your umbrella kicks in. And that's what it's for is to cover those underlying limits.
>
> So, I wouldn't have even known to ask for a different coverage for uninsured motorist compared to umbrella.

As we have stated, the UM coverage in the 1999 CIC policy was provided by an endorsement to the umbrella policy. Specifically, Form 203 is the "excess uninsured motorist

coverage endorsement – Tennessee." (Capitalization in original omitted.) Paragraph 4 of the form in the 1999 CIC policy sets the limits as follows: "Our limit of liability under this endorsement is the limit of coverage/liability shown in the Declarations or $1,000,000, whichever is less." (Underlining in original.) The underlining in the form is actually a blank into which the numerical figure of $1,000,000 is typed. Thus, had the Insured read the 1999 CIC policy, he would have seen that his UM coverage was $1,000,000.

A similar process was repeated for the 2002 CIC policy. Huffaker generated the application. CIC issued the policy. Huffaker mailed a copy of the policy to the Insured and billed him for the insurance. The 2002 CIC policy has the figure $1,000,000 typed into a blank space in Form 203 as the limits of UM coverage. It is undisputed that since 1999, the Insured paid premiums based on UM coverage of $1 million. However, according to his testimony, he thought he was getting $2 million coverage for the premium he was paying.

As we have previously stated, the umbrella was renewed in 2005 with liability limits of $2 million. However, the blank space provided in the Form 203 UM endorsement for typing in the policy limits was left blank; the controlling language in the form for the policy limits thus became "the Limit of Insurance shown in the Declarations . . . ," which was $2 million. Most of the testimony at trial was whether the space was supposed to have been left blank, and, if not, what was supposed to have been typed in the blank space.

The managing underwriter, Deborah Hitt, testified that "[o]ne million dollars" was supposed to have been typed in the blank. Instructions were given to the typist to "type in" $2,000,000 for the liability amount on the umbrella and $1,000,000 for the UM limits on Form 203. She also testified that the premium charged was based upon UM coverage of $1 million. The typist who actually prepared Form 203 for the 2005 CIC policy testified by deposition. He testified that "there should be a limit [of $1 million] typed on the [Form] 203." He further testified that "[m]ore than likely" he just "skipped right over" that part of the instructions. Hugh Huffaker testified that the omission of the "limit of insurance available under this endorsement . . . would be a mistake."

The policy was renewed again in 2008 after the accident. Again, the umbrella limit was set at $2 million. The UM coverage was $1 million.

After hearing the proof, the court made certain findings of fact and conclusions of law, including the following, in its memorandum opinion:

> In 2005 the typist, Anthony Richardson inadvertently omitted to type in the $1,000,000 upon the [Form] 203 . . . and left it blank.

-4-

Anthony Richardson . . . admits that the setup sheets and instructions he received specifically indicated that the $1,000,000 was to be typed in, but he merely made an error and failed to type it in.

[The Insured] was not aware of any potential typing error until long after the litigation had ensued since he never read his policies.

The 2008 policy that was renewed after the personal injury lawsuit filed by Mr. Peters had the $1,000,000 typed in on the Form 203. . . .

All of the paperwork and underwriting file of [CIC] showed that [the Insured] intended to purchase and [CIC] intended to sell an Umbrella policy containing $2,000,000 of liability coverage and $1,000,000 of Excess UM coverage.

\* \* \*

Ms. Hitt has a recollection and e-mails confirming that instructions received from the independent agent retained by [the Insured] to renew the policy in 2005 did not include any requested changes.

Although the . . . [a]pplication submitted by [Huffaker] was not signed by [the Insured], he does not contend that Mr. Huffaker in any way exceeded his authority or that Huffaker did not have his permission to submit the application as requested. Signing an application by the insured was not a requirement by [CIC].

\* \* \*

[The Insured] does not suggest or allege that Mr. Huffaker at any time did anything improperly or incorrectly.

\* \* \*

While [the Insured] take[s] the position that the coverage period during 2005 to 2008 should include $2,000,000 Excess UM

coverage, they do not address the fact that they only had $1,000,000 Excess UM coverage during the six years with [CIC] before 2005, or that the current policy period is written for the same $1,000,000 Excess UM limit.

* * *

. . . It is clear that currently TCA § 56-7-1201 does not require insurers to sell excess uninsured motorist coverage in the state of Tennessee. The Court of Appeals specifically addressed this issue in State Farm v. Stone, 2008 [WL] 212987 (TN Ct. 2008). Therefore, any issues regarding written rejections are irrelevant. It is clear from the evidence that there was an established and clear pattern of practice of [the Insured] and that included . . . instructing and agreeing to allow his agent to search out the best recommended deals to be submitted to him for his approval. [The Insured] allowed his agent to submit to [CIC] a request for insurance coverage, which was renewed every year in the amount of $2,000,000 for Umbrella Liability and $1,000,000 Excess UM coverage.

[The Insured] presented as a sophisticated business person who knows the importance of written contracts and chose not to have read his insurance contracts. He cannot now rely on after the fact assumptions in order to create coverage that he never purchased.

It is undisputed that there was a renewal of the 2005 policy for the same terms as the previous policy, which included $1,000,000 of Excess UM coverage and that but for the typographical error of Anthony Richardson, $1,000,000 would have been typed into the appropriate [Form] 203 . . . . It is also evident that at no time has [the Insured] paid premiums for $2,000,000 of Excess UM coverage nor asked that any policy be reformed to provide $2,000,000 of Excess UM coverage, including the current policy that it purchased.

It is clear and convincing to the court, from the evidence presented, that both [the Insured] and [CIC] intended to renew its Umbrella policy of insurance in the amount of $1,000,000 for

-6-

Excess UM coverage but for the omission of "filling in the blank" the $1,000,000 on [F]orm . . . 203.  The court finds that [CIC] has met its burden "to reform the contract by the insertion of '$1,000,000' in the blank space.["]

(Underlining in original.)

The court later dismissed the case finding that CIC could have no liability under the UM policy as reformed since the Insured had recovered an amount equal to the policy limits of $1 million.  The Insured timely filed a notice of appeal.

II.

The Insured raises the single issue of whether CIC "present[ed] clear and convincing evidence that the parties reached a prior agreement that varied from the insurance policy that was issued in 2005."

III.

The normal standard of review for a trial court's findings in a civil case is found in Tenn. R. App. P. 13(d), as explained in *Hughes v. Metropolitan Government of Nashville and Davidson County*, 340 S.W.3d 352 (Tenn. 2011):

> In a civil case heard without a jury, the trial court's findings of fact are presumed to be correct unless the evidence preponderates otherwise.  When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony.  Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary.  Questions of law are subject to de novo review with no presumption of correctness.

*Id.* at 359 -360 (citations omitted).  However, when the law requires, as in this case, clear and convincing evidence, this court must "review the proof to determine whether it is such as to establish in the trier of fact an abiding conviction that it is highly probable" the elements of the cause of action are present.  *Lee v. Stanfield*, No. E2008-02168-COA-R3-CV, 2009 WL

4250155, at *8 (Tenn. Ct. App. E.S. filed Nov. 30, 2009)(*citing Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 535-36 (Tenn. Ct. App. 2001)).

## IV.

All parties agree that the standards for reforming a contract are accurately set out in *Sikora v. Vanderploeg*, 212 S.W.3d 277 (Tenn. Ct. App. 2006). *Sikora* states:

> The judicial alteration of the provisions of a written agreement is an equitable remedy known as "reformation." The basic purpose of reformation is to make the contract conform to the real intention of the parties. It is driven by a respect for the parties' intent and gives effect to the terms mutually agreed upon by the parties. Because the law strongly favors the validity of written instruments, a person seeking to reform a written contract must do more than prove a mistake by a preponderance of the evidence. Instead, the evidence of mistake must be clear and convincing.
>
> An important subcategory of mistake is mistake in the expression, or integration, of the agreement. A mistake in expression occurs where one or both parties to a written contract erroneously believe that the contract embodies the agreement that both parties intended it to express. In such cases, the courts may adjust the provisions of the written contract to make it express the true agreement reached by the parties.
>
> In order to obtain reformation on the basis of mistake in expression, a party must present clear and convincing evidence that: (1) the parties reached a prior agreement regarding some aspect of the bargain; (2) they intended the prior agreement to be included in the written contract; (3) the written contract materially differs from the prior agreement; and (4) the variation between the prior agreement and the written contract is not the result of gross negligence on the part of the party seeking reformation. Reformation is not automatically barred simply because one of the parties denies that there was an antecedent agreement or claims that the mistake was not mutual.

> As long as the party seeking reformation establishes the elements of a mistake in expression, any discrepancy between the parties' prior agreement and their written contract is presumed to be the result of a mutual mistake (unless, of course, there is evidence of fraud). . . .

*Id*. at 287 -288 (footnotes, citations and internal quotation marks omitted).

The Insured argues that there was no mutual mistake regarding the 2005 CIC policy because the UM coverage under that policy was exactly as he "understood" it to be all along. The Insured's reliance on his own understanding is to no avail, however, as it overlooks the undisputable evidence that the 1999 CIC policy had express UM limits of $1 million, that the 2002 CIC policy had express UM limits of $1 million and that the intent in 2005 was to renew the policy with no changes to existing coverage. "Where the parties to a contract of insurance agree to a renewal, it is presumed that the same terms, conditions, premiums and subject matter obtain in the new contract as in the old." ***Brower v. Vanguard Ins. Co.***, 614 S.W.2d 360, 363 (Tenn. Ct. App. 1980).

The Insured suggests that there could not have been a prior agreement because there was never an agreement as to the UM coverage limits, even with regard to the 1999 CIC policy and the 2002 CIC policy. Again, the Insured overlooks the controlling facts and law. He was mailed a copy of both prior policies. They both expressly stated UM limits of $1 million. He would have known that if he had read the policies. The law imputes to the Insured the knowledge that he would have had if he had read either the 1999 CIC policy or the 2002 CIC policy. *See* ***Webber v. State Farm Mutual Auto Ins. Co.***, 49 S.W.3d 265, 274 (Tenn. 2001). As the High Court stated in ***Webber***,

> The law has long been settled that "in the absence of fraud or mistake, an insured cannot claim that he is not bound by the contract of insurance, or certain provisions thereof, because he has not read it, or is otherwise ignorant of, or unacquainted with its provisions." ***General Am. Life Ins. Co. v. Armstrong***, 182 Tenn. 181, 185–86, 185 S.W.2d 505, 506–07 (1945). Indeed, this Court has stated that "the insured is *conclusively presumed* to have knowledge of, and to have assented to, all the terms, conditions, limitations, provisions or recitals in the policy," irrespective of whether the insured actually read, or could read, the insurance contract. *Id*. at 186, 185 S.W.2d at 507 (citations omitted and emphasis added); ***De Ford v. National Life & Accident Ins. Co.***, 182 Tenn. 255, 266–67, 185 S.W.2d 617,

621–22 (1945) (recognizing and applying the same rule, even when the insured could not read the contract).

We simply cannot accept the plaintiff's argument that his failure to read the notices provided by the defendant over the course of ten years somehow permits him to alter or revise the extent of the defendant's contractual obligation. As this Court has stated in rejecting similar arguments,

> "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written."

*De Ford*, 182 Tenn. at 267, 185 S.W.2d at 622 (*quoting Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L.Ed. 203 (1875)). Therefore, we hold that even if the plaintiff did not read any of the nearly twenty separate notices provided by the defendant, he is conclusively presumed to possess full knowledge of the insurance contract provisions as a matter of law. Accordingly, the plaintiff's argument that he was without sufficient knowledge to form an intent to ratify the insurance contract is without merit.

*Id*. at 274.

We hold that the evidence does not preponderate against the trial court's finding, made by clear and convincing evidence, that the parties intended in 2005 to renew the umbrella and its UM endorsement on the same terms as the 1999 CIC policy and the 2002 CIC policy. Therefore the trial court did not err in reforming the policy accordingly or in ultimately dismissing the claim against CIC.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, Alan Howard Peters and wife, Edith H. Peters. This case is remanded, pursuant to applicable law, for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE