# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 18, 2014 Session

## CAROLYN M. HEATON v. JASON BARRETT HEATON

**Appeal from the Chancery Court for Hamilton County**
**No. 12-0412     Jeffrey M. Atherton, Chancellor**

_____

### No. E2013-01985-COA-R3-CV-FILED-AUGUST 29, 2014

_____

This case focuses on whether the trial court properly enforced and interpreted the parties' prenuptial agreement when equitably dividing their assets incident to a divorce and whether the trial court properly set child support pursuant to the Child Support Guidelines. The plaintiff filed a complaint for divorce on May 30, 2012. The parties proceeded to trial in May 2013 on the issues of property division, child support, and attorney's fees. An agreement was reached concerning a co-parenting schedule for their daughter. The court found that the parties' prenuptial agreement was enforceable but that it did not require that the parties' jointly owned marital residence be divided equally. The trial court did, however, divide the parties' jointly owned personalty equally. In making findings with regard to the parties' respective annual income amounts, the court set child support accordingly. The trial court also declined to award attorney's fees to either party. Husband timely appealed. We vacate the trial court's rulings regarding division of the real property, the award of child support, and attorney's fees, and we remand this case to the trial court for further proceedings consistent with this opinion. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in Part, Affirmed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J., joined. CHARLES D. SUSANO, JR., C.J., filed a separate dissenting opinion.

Jennifer K. Peck, Chattanooga, Tennessee, for the appellant, Jason Barrett Heaton.

Jeffrey A. Miller, Cleveland, Tennessee, for the appellee, Carolyn M. Heaton.

# OPINION

## I. Factual and Procedural Background

Carolyn M. Heaton ("Wife") and Jason Barrett Heaton ("Husband") were married on October 21, 2006, in Alabama. One child, Ava, was born of the marriage, and she was three years old at the time of trial. Prior to their marriage, the parties entered into a written prenuptial agreement, which recites, *inter alia*, that the parties desired for all separate property obtained by them during the marriage to remain separate. The agreement also provides that the only property to be considered jointly owned would be that property specifically designated as such. At the time of the marriage, Wife was the settlor and beneficiary of a substantial irrevocable trust.

The prenuptial agreement, in relevant part, contains a provision entitled "Co-Owned Property," which states:

> **6.1 <u>Definition</u>.** The parties acknowledge that they are each free to acquire property during the marriage either in their own name or in joint names. Any property acquired during the marriage shall conclusively be deemed the Separate Property of the party in whose name such title is held <u>unless</u> such property is expressly acquired and held in the name of both parties as evidenced in a writing clearly expressing an intent that the property covered by the writing is to be so held ("Co-Owned Property") or as to which the deed or document evidencing title is in the name of both parties and creates, expressly or as a matter of law, a tenancy in both parties with the right of survivorship.

(Emphasis in original.) The prenuptial agreement also provides that, upon divorce, Co-Owned Property will be "divided into equal shares by the parties in further settlement of the respective marital rights" and that if one party desires to retain the Co-Owned Property, he or she can purchase the other party's interest at fair market value. The prenuptial agreement further provides that home furnishings purchased after the marriage and wedding gifts will be jointly owned and will be divided equally if the marriage is dissolved.

In June 2009, the parties purchased certain improved real property, with the deed reflecting that title was being acquired by both parties as husband and wife. A few months after purchasing the property, the parties tore down the existing structure and began building their "dream home." Husband acted as the general contractor for construction of the home. Although he was not a licensed contractor, he was able to proceed in this capacity and obtain all the necessary building permits because he was listed as an owner of the property. *See*

*generally* Tenn. Code Ann. §§ 62-6-103 and -120 (Supp. 2013). Construction took approximately two years. During construction, Husband was paid $600 per week by Wife, which he utilized to pay his bills and contribute to expenses of the household. Wife did not issue Husband an IRS Form 1099 for these payments.

Wife filed a complaint for divorce against Husband on May 30, 2012. Wife asserted that the parties' prenuptial agreement controlled all financial issues relative to their divorce. Husband answered, admitting that a valid prenuptial agreement existed and asserting that this agreement should control. On March 8, 2013, Wife amended her complaint to add a claim seeking reformation of the deed to the marital residence, and averring that Husband's name was erroneously included as grantee. Wife stated that she contributed all of the funds to purchase the real property and build the home, and she alleged that it was the parties' intent that this real property constitute Wife's separate property. The trial court entered an order allowing Wife to amend her complaint. Husband responded by filing an amended answer, presenting the defense of estoppel by deed.

The parties reached an agreement as to the terms of a permanent parenting plan, which provided in part that each parent would have equal time with the child. A trial was conducted on May 31, 2013, regarding financial issues, including property division, child support, and attorney's fees. At trial, Wife testified that the inclusion of Husband's name on the deed to the real property was a mistake. In support, she asserted that her intent was to be the sole owner of the property because it was purchased entirely with her separate funds. Wife claimed that she instructed the realtor to have the deed drafted to name her as the only grantee. This would support the fact that she was also the sole applicant on the attendant mortgage. As Wife explained, although she objected to Husband's name on the deed at closing, she was told by the closing agent that because the parties were married, Husband's name was required by state law to appear on the deed. According to Wife, she relied upon this advice to her detriment and did not learn that no such requirement existed until the divorce proceedings were underway. Wife admitted that she knew upon leaving the closing that Husband's name appeared on the deed, due to no fraud on Husband's part. Wife also admitted that she had never attempted to correct the deed prior to the divorce proceedings.

Wife further explained that Husband had never paid any monies toward the purchase, construction, or maintenance of this real property. As she related, the parties kept all of their finances separate during the marriage. As such, Wife paid Husband $102,000 for his services as contractor in the construction of the home. Wife admitted that Husband sought and acquired the necessary permits for building the home as a co-owner of the property. She also related that the parties intended the construction to serve as their dream house while launching Husband's career as a contractor.

William Weathers, the realtor who drafted the sales contract concerning the subject real property, testified that the agreement listed only Wife as the buyer, per the parties' instructions. Mr. Weathers further explained that the sales contract specifically provided for the deed to be prepared in Wife's name only. As Mr. Weathers was present at the closing, he related that Wife was upset when the deed was presented initially containing both parties' names. He testified that Wife adamantly insisted that the deed be in her sole name. According to Mr. Weathers, Husband remained calm and questioned whether his presence was even necessary at the closing. Despite Wife's objections, the closing proceeded with Wife signing the necessary documents. Mr. Weathers confirmed that the title agent told Wife that Husband's name was required on the deed.

Sandra Clayborne, a mortgage loan originator for Regions Bank, testified that Wife applied for the loan regarding the subject real property in her sole name and that the loan application was approved. Ms. Clayborne related that Wife informed her that the real property was to be Wife's separate property. Ms. Clayborne suggested that because the mortgage company did not require that Husband's name be included on the deed, the inclusion of his name could have been a mistake.

According to Husband's testimony, the parties intended to purchase the property together, build their dream house thereon, and reside together into their retirement years. Husband admitted that he did not contribute any money toward the purchase of the land or the construction of the home and that he and Wife kept their finances separate. He also admitted that Wife paid him an allowance while he was working on the home so that he could pay his bills and contribute to household expenses. Although Husband maintained that this allowance was not intended to compensate him for his services as contractor, he opined that his work as general contractor was worth significantly more than the $600 per week allowance he received during construction. Husband related that he was present at the closing and did not understand the exchange between Wife and the title agent. As Husband explained, he used his status as co-owner of the home to save the parties money during construction because he was able to procure special discounts from vendors and obtain the necessary permits. Husband's parents both testified that Wife always referred to the house as "their" home, thereby suggesting joint ownership.

Husband further testified that his average income at the time of trial was approximately $2,000 per month. According to Husband, he was currently performing irrigation work and landscaping as well as outdoor construction and remodeling. As a high school graduate, Husband had also taken college courses but lacked about nineteen hours in earning a degree from U.T. Chattanooga.

Wife indicated that her income was derived exclusively from her trust. Despite holding two college degrees, Wife contended that she had been unable to secure gainful employment. She claimed that her trust provided income of $1,700 per month compared to her expenses in excess of $9,300 per month. She did admit listing an income of $19,000 per month on the mortgage loan application when she purchased the real property, but she explained that this was only her income for that one particular month. Wife claimed that Husband earned $50,000 to $60,000 per year when they married but that he was often paid in cash.

At trial, the parties presented a combined asset list, which listed the marital residence as having a value of $1,144,000. The outstanding mortgage indebtedness was shown to have a balance of $388,000. Husband therefore asserted that there existed $756,000 in equity value in the improved real property. Wife, however, sought to show that she had "borrowed" money from her trust to finance the construction of the home. She still owed a balance on these "loans" in excess of $960,000, such that according to Wife there existed no equity in the property. Wife presented the proof deposition of her accountant, Vincent James, to support and corroborate her claim regarding the loans relative to her trust.

At the conclusion of the trial, the court entered an order finding that the credibility of both parties had been successfully attacked. The court did, however, find the testimony of Mr. Weathers to be credible. The court likewise found Ms. Clayborne's testimony to be credible as to the real estate transaction.

As one of the primary issues, the trial court determined the parties' prenuptial agreement to be enforceable. The court concluded, however, that Husband's position that the marital residence should be treated as Co-Owned Property pursuant to paragraph 6.1 of the prenuptial agreement was inconsistent with other provisions of the agreement. Wife had substantial trust assets, which were the exclusive source for buying the land and building the home. The court further found that Husband invested no money in the house and was paid for his services as contractor. In relevant part, the trial court explained:

> The Court further finds that the inclusion of the Defendant on the deed was clearly and convincingly shown to be both unexpected by both parties and not desired by either party. The Court finds that declaring the residence at 6557 Fair Harbor Trail to be co-owned property would be inconsistent with the intent and conduct of the parties, not compelled by the pre-marital agreement, and would result in an unequivocally inequitable windfall to the Defendant. The Court finds that the Plaintiff should be awarded the Fair Harbor property and should be responsible for any encumbrance for same.

The court divided the remainder of the assets and liabilities pursuant to the parties' agreed-upon list, finding this distribution to be fair and equitable. Rather than awarding Husband the cash value of the items of personal property awarded to him, the court ordered that Husband take possession of those items.

With regard to child support, the trial court determined that Husband was capable of earning $30,000 per year while Wife's actual income was established at $33,360 per year. Child support was then calculated based upon these income figures, utilizing the child support worksheet. The court ordered that each party pay his or her own attorney's fees. Husband timely appealed.

## II. Issues Presented

Husband presents the following issues for our review, which we have restated slightly:

1.      Whether the trial court erred by failing to award Husband one-half of the equity value in the jointly titled real property pursuant to the terms of the prenuptial agreement.

2.      Whether the trial court erred by requiring Husband to take possession of one-half of the actual household furnishings rather than awarding him half of the value of those furnishings.

3.      Whether the trial court erred by failing to apply properly the child support guidelines when calculating Wife's income and failing to award retroactive child support.

4.      Whether the trial court erred by failing to award Husband his attorney's fees.

## III. Standard of Review

Our standard of review is *de novo* with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *McCarty v. McCarty*, 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992). No presumption of correctness attaches to the trial court's legal conclusions. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The findings of the trial court involving the credibility of witnesses are entitled to great weight on appeal. *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 849 (Tenn. Ct. App. 1982).

We review issues of contract interpretation *de novo*. *See Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). As this Court has previously explained:

> In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am.Jur.2d, *Contracts*, § 245).

*Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005). "Courts must look at the plain meaning of the words in a contract to determine the parties' intent. If the contractual language is clear and unambiguous, the literal meaning controls . . . ." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009) (internal citation omitted).

## IV. Real Property

### A. No Reformation of Deed

Husband asserts that the trial court erred by failing to award him one-half of the equity in the parties' jointly owned real property pursuant to the terms of the prenuptial agreement. Husband contends that because the deed to the property reflected the names of both parties as grantees, the real property is Co-Owned Property subject to equal division upon divorce. Wife claims that the trial court properly reformed the deed due to a mistake. She therefore contends that the real property was properly determined by the trial court as constituting her separate property and therefore not subject to division.

-7-

With regard to the reformation of a deed, this Court has previously stated:

> Reformation is an equitable doctrine by which courts may correct a mistake in a writing "so that it fully and accurately reflects the agreement of the parties." 22 Tenn. Jur. Rescission, Cancellation and Reformation § 46 (1999). In order to reform a writing on the basis of mistake, there must have been either a mutual mistake or a unilateral mistake induced by fraud. *Williams v. Botts*, 3 S.W.3d 508, 509 (Tenn. Ct. App. 1999), perm. app. denied October 4, 1999. "A 'mistake' is an act which would have been done, or an omission which would not have occurred, but from ignorance, forgetfulness, inadvertence, mental incompetence, surprise, misplaced confidence, or imposition. . . ." *Id*. at 509-10. Reformation is appropriate only where the mistake or fraud is shown by "clear, cogent, convincing evidence." *Dixon v. Manier*, 545 S.W.2d 948, 950 (Tenn. Ct. App. 1976).

*Lane v. Spriggs*, 71 S.W.3d 286, 289-90 (Tenn. Ct. App. 2001) (affirming trial court's reformation of the deed when the grantor accidentally failed to sign one of four deeds transferring title to property to his children, and the child with the unsigned deed sought reformation so that her deed would be valid).

We disagree with Wife's position. First, a thorough review of the trial court's ruling in this matter demonstrates that the trial court did not reform the deed and vest title to the real property in Wife as sole owner. Although Wife prayed for relief through reformation of the deed in her amended complaint, the court's final order does not reference reformation of the deed as a basis for its decision. Furthermore, even if a grant of reformation was implied from the trial court's ruling, we conclude that there exists no factual or legal basis upon which the trial court could grant reformation of this deed.

As this Court has elucidated:

> The judicial alteration of the provisions of a written agreement is an equitable remedy known as "reformation." The basic purpose of reformation is to make the contract conform to the real intention of the parties. It is driven by a respect for the parties' intent and gives effect to the terms mutually agreed upon by the parties. Because the law strongly favors the validity of written instruments, a person seeking to reform a written contract must do more than prove a mistake by a preponderance of the evidence. Instead, the evidence of mistake must be clear and convincing.

An important subcategory of mistake is mistake in the expression, or integration, of the agreement. A mistake in expression occurs where one or both parties to a written contract erroneously believe that the contract embodies the agreement that both parties intended it to express. In such cases, the courts may adjust the provisions of the written contract to make it express the true agreement reached by the parties.

In order to obtain reformation on the basis of mistake in expression, a party must present clear and convincing evidence that: (1) the parties reached a prior agreement regarding some aspect of the bargain; (2) they intended the prior agreement to be included in the written contract; (3) the written contract materially differs from the prior agreement; and (4) the variation between the prior agreement and the written contract is not the result of gross negligence on the part of the party seeking reformation. Reformation is not automatically barred simply because one of the parties denies that there was an antecedent agreement or claims that the mistake was not mutual.

As long as the party seeking reformation establishes the elements of a mistake in expression, any discrepancy between the parties' prior agreement and their written contract is presumed to be the result of a mutual mistake (unless, of course, there is evidence of fraud) . . . .

*Peters v. Burgess*, 416 S.W.3d 394, 400-01 (Tenn. Ct. App. 2011) (quoting *Sikora v. Vanderploeg*, 212 S.W.3d 277, 287-288 (Tenn. Ct. App. 2006)) (footnotes, citations, and internal quotation marks omitted).

In the case at bar, there was no allegation or evidence of fraud or mutual mistake. Instead, the evidence demonstrated that although Wife initially requested that the deed be drafted to reflect Wife as sole grantee, when she arrived at the closing, she discovered that the deed included both of the parties' names. Notwithstanding this fact, Wife accepted the deed and allowed the closing to go forward. Therefore, there exists no mistake warranting instrument reformation inasmuch as it was not shown that "one or both parties to a written contract erroneously believe[d] that the contract embodie[d] the agreement that both parties intended it to express." *Peters*, 416 S.W.3d at 401. Wife clearly knew that the deed contained both names when she accepted it. Further, there is no mutuality because the alleged mistake is not "common to both parties to the instrument." *Hearne v. Marine Ins. Co.*, 87 U.S. 488, 491 (1874) (holding that "a mistake on one side may be a ground for rescinding, but not for reforming, a contract.").

As this Court has explained:

"Reformation of a written instrument will not be decreed where the instrument accords with the purpose of the parties at the time of its execution; * * * they are not entitled to such relief merely because their intentions were influenced by mistaken considerations. The question always is, What did the parties intend at the time they contracted? not what they would have done if they had been better informed.'

*Mitchner v. Taylor*, 412 S.W.2d 1, 4 (Tenn. Ct. App. 1965) (quoting *Pittsburg Lumber Co. v. Shell*, 189 S.W. 879 (Tenn. 1916)).

Having failed to show the existence of a mistake warranting reformation of the subject deed, Wife cannot claim that this was the actual basis for the trial court's decision to award title to the real property solely to her.

### B. Co-Owned Property Pursuant to Terms of Prenuptial Agreement

As the trial court determined that the parties' prenuptial agreement was enforceable, both parties urged the court to apply it in determining their respective financial status and property rights incident to the divorce. Husband contends that the trial court failed to enforce the specific terms of the prenuptial agreement. As Husband posits, the real property at issue should have been deemed Co-Owned Property subject to equal division. We agree with Husband.

As previously explained, Husband's position that the marital residence be treated as Co-Owned Property pursuant to paragraph 6.1 of the prenuptial agreement was determined by the trial court to be inconsistent with other provisions of the agreement. The court expressly cited paragraph 2, which states in part that the purpose of the agreement is to demonstrate that the parties wish to enter into the marriage for reasons other than the "acquisition by either of them of any interest in any property which the other may now or hereafter own or acquire." The court also referenced paragraph 5.8, which defines property as, *inter alia*, "property or interests in property of whatever nature, as well as all income or dividends from, products of, and increases in the value of or from, such property and interests, realized or unrealized, and derived or occurring at any time."

The trial court concluded that Wife owned substantial trust assets, which provided the exclusive source for purchasing the land and building the home. In determining that Husband invested no money in the house and was paid for his services in the capacity of contractor, the trial court explained:

The Court further finds that the inclusion of the Defendant on the deed was clearly and convincingly shown to be both unexpected by both parties and not desired by either party. The Court finds that declaring the residence at 6557 Fair Harbor Trail to be co-owned property would be inconsistent with the intent and conduct of the parties, not compelled by the pre-marital agreement, and would result in an unequivocally inequitable windfall to the Defendant. The Court finds that the Plaintiff should be awarded the Fair Harbor property and should be responsible for any encumbrance for same.

The parties agree that the prenuptial agreement is controlling on this issue. As previously explained, the prenuptial agreement declares that:

> Any property acquired during the marriage shall conclusively be deemed the Separate Property of the party in whose name such title is held <u>unless</u> such property is expressly acquired and held in the name of both parties as evidenced in a writing clearly expressing an intent that the property covered by the writing is to be so held ("Co-Owned Property") or as to which the deed or document evidencing title is in the name of both parties and creates, expressly or as a matter of law, a tenancy in both parties with the right of survivorship.

(Emphasis in original.) We conclude that the real property at issue falls squarely within the definition of Co-Owned Property as defined by the prenuptial agreement. The warranty deed transferred title into the names of both parties as husband and wife, thereby creating a tenancy by the entireties that inherently establishes a right of survivorship. *See Weaver v. Hamrick*, 907 S.W.2d 385, 388 (Tenn. 1995). As such, the subject prenuptial agreement dictates that the real property at issue be deemed Co-Owned Property because "the deed or document evidencing title is in the name of both parties and creates, expressly or as a matter of law, a tenancy in both parties with the right of survivorship."

Moreover, we do not find any other provisions of the prenuptial agreement to be inherently contradictory to the clearly expressed intent of this paragraph defining Co-Owned Property. Paragraph 2 discusses the parties' intent in executing the prenuptial agreement. There was no proof that Husband entered into the marriage to acquire property interests belonging to Wife. Further, Paragraph 5.8, which is contained within the section discussing "Separate Property," merely recites that "property" will include, *inter alia*, all income, dividends, products, and increases in value from an asset. Neither of these provisions contradicts Paragraph 6.1 as to Co-Owned Property. In fact, Paragraph 5.2 regarding Separate Property states:

-11-

Unless otherwise specifically provided in this Agreement and except as otherwise agreed in writing by the parties, all property owned by either Carolyn or Jason as Separate Property is and shall remain his or her respective Separate Property within the meaning of this Agreement, except and unless the property is held as "Co-Owned Property" as hereinafter defined under Section 5 below.

Pursuant to the express terms of the section regarding Co-Owned Property, the real property at issue qualifies as Co-Owned and therefore is no longer Wife's separate property, even though her separate property was used to purchase it.

The prenuptial agreement further provides that Co-Owned Property "shall be divided into equal shares by the parties in further settlement of the respective marital rights," and that if one party desires to retain the Co-Owned Property, he or she can purchase the other party's interest at fair market value. As this real property clearly fits the definition of Co-Owned Property pursuant to the terms of the prenuptial agreement, the trial court erred in vesting title solely in Wife's name without awarding Husband his equal share.[1] We therefore reverse the trial court's award of the real property solely to Wife and remand this action for further proceedings by the trial court to effectuate an equal distribution of this asset to both parties. Pursuant to the prenuptial agreement, the court can either transfer a one-half interest in the real property to Husband or allow Wife to pay Husband one-half of the asset's fair market value in order for her to retain it as her sole property.

We also note that despite Wife's claim that she owed an indebtedness of "loans" from her trust that would effectively eliminate any equity value in the real property, the trial court questioned the validity of this claim and the documentation purportedly evincing these loans. The trial court, however, failed to specifically rule upon this issue because Wife was found to be sole owner of the property. Therefore, upon remand, the trial court should make specific findings regarding the equity value of the real property before equally dividing the property in accordance with the prenuptial agreement.

---

[1]Even if the prenuptial agreement were not enforceable, the property would still be deemed to be marital property subject to an equitable division, as this Court previously ruled in *Potter v. Potter*, No. E2012-02390-COA-R3-CV, 2013 WL 4458839 (Tenn. Ct. App. Aug. 19, 2013). It is also noteworthy that in *Potter*, the husband claimed that he was surprised that his wife's name was placed on the deed, and "when he questioned the attorney who prepared the deed about this alleged error, the attorney told him that the deed had to be in the names of both parties because they were married." *Id*. at *4. Regardless of this fact, this Court still ruled that the home was marital property. *Id.*

## V. Personal Property

With reference to personalty, the parties' prenuptial agreement provides:

The parties agree that after their marriage all furnishings in their home are and will continue to be the property of the person who owned them prior to their marriage. Any furnishings and household goods purchased after the date of this Agreement, regardless of who pays for them, and all wedding gifts shall be the joint and equal property of Carolyn and Jason as tenants by the entirety. If the parties separate or their marriage is dissolved, all furnishings and household goods purchased <u>after</u> the date of this Agreement and all wedding gifts shall be divided equally between the parties, and upon the death of one of them the survivor shall be the sole owner of such property.

(Emphasis in original.)

Pursuant to this provision, the trial court awarded Husband one-half of the parties' co-owned personalty. Husband asserts that the trial court erred in failing to simply award him the value of his half of the household furnishings rather than requiring him to take possession of one-half of the actual furnishings. The above provision states, however, that the "furnishings" will be divided equally rather than divided by monetary award. We therefore conclude that the trial court properly distributed the parties' personalty in accordance with the terms of the prenuptial agreement. This issue is without merit.

## VI. Child Support

Husband argues that the trial court erred in determining Wife's income for child support purposes. The court found that Wife's income should be established at $33,360 per year, declining to accept the significantly larger income amounts reflected on Wife's federal income tax returns. Wife asserts that she is the beneficiary of an irrevocable trust from which she receives interest income of only $29,000 per year. According to Wife, the remainder of the income shown on her tax returns are funds flowing back into her trust that she does not personally receive.

With reference to Wife's income, the trial court stated:

The Court finds and does not credit the Plaintiff's testimony that her gross income is limited to $29,287 as testified. Rather, the Court finds that wife's gross income is $33,360, which represents $2,780 monthly, and that number shall be inserted into Section III. Paragraph A(2) of the Proposed Permanent

Parenting Plan and the Child Support Worksheet.

In the court's memorandum opinion, which was incorporated by reference into the trial court's written order, the court noted that Wife's annual income of $33,360 was based on the yearly interest income of $29,287, plus the annual income from her Merrill Lynch account of $4,073. The court made no other express findings regarding Wife's income, except to note that "the Court is not aware of a regulation that mandates the exclusive and sole use of individual tax returns as the basis for calculating [income]."

This Court has described the proper standard of review for child support determinations as follows:

> Setting child support is a discretionary matter. Accordingly, we review child support decisions using the deferential "abuse of discretion" standard of review. This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives. While we will set aside a discretionary decision if it rests on an inadequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative.

*State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). *See also Massey v. Casals*, 315 S.W.3d 788, 798 (Tenn. Ct. App. 2009) ("We note that determinations of child support lie within the discretion of the trial court.").

The applicable definition of gross income as provided in the Child Support Guidelines is as follows:

> Gross income of each parent shall be determined in the process of setting the presumptive child support order and **shall include all income from any source** (before deductions for taxes and other deductions such as credits for other qualified children), whether earned or unearned, and includes, but is not limited to, the following:
>
> (i) Wages;
>
> (ii) Salaries;
>
> (iii) Commissions, fees, and tips;

(iv) Income from self-employment;

(v) Bonuses;

(vi) Overtime payments;

(vii) Severance pay;

(viii) Pensions or retirement plans including, but not limited to, Social Security, Veteran's Administration, Railroad Retirement Board, Keoughs, and Individual Retirement Accounts (IRAs);

(ix) **Interest income**;

(x) **Dividend income**;

(xi) **Trust income**;

(xii) Annuities;

(xiii) **Net capital gains**;

(xiv) Disability or retirement benefits that are received from the Social Security Administration pursuant to Title II of the Social Security Act, whether paid to the parent or to the child based upon the parent's account;

(xv) Workers compensation benefits, whether temporary or permanent;

(xvi) Unemployment insurance benefits;

(xvii) Judgments recovered for personal injuries and awards from other civil actions;

(xviii) Gifts that consist of cash or other liquid instruments, or which can be converted to cash;

(xix) Prizes;

(xx) Lottery winnings; and

(xxi)Alimony or maintenance received from persons other than parties to the proceeding before the tribunal.

Tenn. Comp. R. & Regs., ch. 1240-02-04-.04 (emphasis added).

Wife's accountant, Mr. James, testified that Wife received interest income from a promissory note of approximately $29,287 per year. As Mr. James explained, all of Wife's assets were owned by her trust, which was an estate planning tool intended to minimize estate taxes. All income from Wife's assets flowed into the trust and had to be reported on her federal income tax return, regardless of whether she actually received the income. In 2011, Mr. James reported that the parties' joint income as shown on their federal tax return was $175,000, which included income Wife received from dividends, interest, and capital gains. Of this amount, only $1,463 was attributable to Husband, representing the net profit from his business. Similarly, the parties' 2010 income tax return demonstrates a gross income of $129,594, with the parties' 2009 income tax return demonstrating a gross income of $48,442. Mr. James maintained, however, that Wife only received spendable income of approximately $29,000 per year in interest income from the promissory note. He testified that she also derived income from her Merrill Lynch account in the amount of $4,073 in 2011.

Mr. James represented that Wife's disbursements taken from the trust to build the marital residence, totaling over $960,000, were actually loans against the trust that Wife was not required to repay. According to Mr. James, he "hoped" that Wife would repay the loans in order to rebuild the trust corpus. The trial court expressed concern with the veracity of Mr. James's testimony regarding these loans "in light of inconsistencies of the dates of preparation and execution of certain documents related to the draws for the house and note."

Despite holding two college degrees, Wife claimed that she had been unable to secure gainful employment. To support Wife's current lifestyle, she incurs monthly expenses exceeding $9,300. She claims to only receive income of $1,700 per month. Husband presented proof that Wife listed her income on the mortgage loan application in 2009 as $19,000 per month. According to Wife, this amount only represented her income for one particular month.

As the Child Support Guidelines expressly state and as this Court has previously held, gross income for child support purposes shall include income from any source, including, *inter alia*, interest income, dividends, trust income, and capital gains. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04; *see also Moore v. Moore*, 254 S.W.3d 357, 360 (Tenn. 2007); *Hommerding v. Hommerding*, No. M2008-00672-COA-R3-CV, 2009 WL 1684681 at *5 (Tenn. Ct. App. June 15, 2009); *Ford v. Ford*, No. 01A01-9611-CV-00536, 1998 WL 730201 at *5 (Tenn. Ct. App. Oct. 21, 1998)("*Ford II*"). Further, our prior decisions have

determined that income flowing back into a trust, even if it is simply reinvested, should still be considered income for child support purposes. *See, e.g., Hommerding*, 2009 WL 1684681 at *5; *Ford*, 1998 WL 730201 at *5. Additionally, withdrawals of trust principal have also been determined to constitute income for child support purposes. *See Ford v. Ford*, No. 02A01-9507-CH-00153, 1996 WL 560258 at *2 (Tenn. Ct. App. Oct. 3, 1996)("*Ford I*").

We conclude that the trial court's determination of Wife's income at $33,360 per year lacks a proper evidentiary foundation and fails to consider the totality of Wife's financial resources. The trial court's finding ignores Wife's substantial income from her trust, which includes dividends, interest, and capital gains. The trial court should have considered "all income from any source," rather than simply considering Wife's interest income from the promissory note. *See* Tenn. Comp. R. & Regs., ch. 1240-02-04-.04. We conclude that the trial court's decision regarding child support must be vacated for lack of an appropriate determination of Wife's gross income pursuant to the Child Support Guidelines. Upon remand, the trial court should consider Wife's additional sources of income and whether Wife's variable income from her investments should be "averaged over a reasonable period of time consistent with the circumstances of the case." *See* Tenn. Comp. R. & Regs., ch. 1240-02-04-.04.

We also note that the trial court failed to determine whether income should be imputed to Wife based on her voluntary unemployment. The trial court imputed income to Husband upon finding him to be underemployed, yet the court disregarded Wife's similar situation. Wife testified that she possessed two college degrees but had only applied for three restaurant positions since the parties' separation. Wife presented no proof that she was unable to maintain employment due to any physical or mental impairment. Therefore, upon remand, the trial court shall also consider whether income should be imputed to Wife in addition to her gross income from other sources. *See*, *e.g.*, *Ford I*, 1996 WL 560258 at *4.

Husband also contends that the child support award should have been retroactive to the date of the parties' separation. The Child Support Guidelines state in pertinent part:

1240-02-04-.06. RETROACTIVE SUPPORT.

(1) Unless the rebuttal provisions of Tennessee Code Annotated §§ 36-2-311(a)(11) or 36-5-101(e) have been established by clear and convincing evidence provided to the tribunal, then, in cases in which initial support is being set, a judgment must be entered to include an amount of monthly support due up to the date that an order for current support is entered:

. . .

(b) From the date:

1. Of separation of the parties in a divorce or in an annulment; or

2. Of abandonment of the child and the remaining spouse by the other parent in such cases; or

3. Of physical custody of the child by a parent or non-parent caretaker.

(2) Deviations from the presumption that a judgment for retroactive support shall be awarded back to the date of birth of the child, the date of the separation of the parties, or the date of abandonment of the child shall be supported by written findings in the tribunal's order that include:

(a) The reasons the tribunal, pursuant to Tennessee Code Annotated §§ 36-2-311(a)(11)(A) or 36-5-101(e)(1)©, deviated from the presumptive amount of child support that would have been paid pursuant to the Guidelines; and

(b) The amount of child support that would have been required under the Guidelines if the presumptive amount had not been rebutted; and

© A written finding by the tribunal that states how, in its determination,

1. Application of the Guidelines would be unjust or inappropriate in the particular case before the tribunal; and

2. The best interests of the child or children who are subject to the support award determination are served by deviation from the presumptive guideline amount.

Tenn. Comp. R. & Regs. 1240-02-04-.06.

At the conclusion of the hearing, Husband's attorney asked the trial court to order its child support determination applicable retroactively to the date of the parties' separation pursuant to the above provisions. Upon taking the matter under advisement, the trial court subsequently issued its memorandum opinion, as memorialized in a final written order. The trial court failed to rule on Husband's request that the child support order be retroactive to the date of separation in either its oral or written rulings. Further, the court did not make any findings with regard to a deviation from the presumption of a retroactive support order, as outlined above. We therefore conclude that this issue should be addressed by the trial court on remand as well.

## VII. Attorney's Fees

Finally, Husband asserts that he should have been granted an award of attorney's fees pursuant to the parties' prenuptial agreement, which provides in pertinent part:

> **23. ATTORNEY'S FEES.** If either party files any proceeding or asserts any claim in violation of this Agreement, the other party shall be entitled to recover all reasonable expenses, including reasonable attorney's fees, incurred thereby.

The trial court concluded that each party should bear his or her own attorney's fees, finding that Husband's assertion of an interest in the real property did not represent a violation of the prenuptial agreement warranting an award of fees. Having previously determined that Wife's claim regarding the marital residence is in violation of the prenuptial agreement, however, we conclude that Husband should obtain some reasonable award of fees in defending his rights under the parties' agreement. Upon remand, the trial court is directed to determine an appropriate and reasonable attorney's fee to be awarded to Husband in relation to this sole issue.

## VIII. Conclusion

The trial court's ruling awarding title to the jointly owned real property solely to Wife is vacated, and this matter is remanded to the trial court to effectuate the terms of the prenuptial agreement by equally dividing this asset. The trial court's award of child support is also vacated, and the case is remanded for a determination of the proper amount of child support consistent with this opinion. Upon remand, the trial court must determine Wife's gross income for child support purposes from all sources. The trial court should also determine whether Wife is voluntarily unemployed, requiring that income be imputed to her, and whether child support should be awarded retroactive to the date of the parties' separation. The trial court should further determine the amount of a reasonable attorney's fee award to Husband pursuant to the prenuptial agreement. The trial court's order is

affirmed in all other respects.  Costs on appeal are assessed to the appellee, Carolyn M. Heaton.


_____
THOMAS R. FRIERSON, II, JUDGE